The case for argument is Jean-Paul v. Douma, Mr. Ingersoll. Good morning, Your Honors. May it please the Court, this case is not about this one page waiver form that Mr. Jean-Paul signed on April 4th, 2008. This case is about the three months of confusion and vacillation that led up to Mr. Jean-Paul signing this form and how the record is silent as to if or when or how that confusion was ever resolved. It of a defendant's fundamental constitutional rights, including the right to counsel. And in Feretta, the Supreme Court established the bedrock principle that a waiver of counsel must be knowing and intelligent. What could be more clear than his waiver? Your Honor, it's not enough that a waiver be voluntary. It has to be knowing and intelligent. I say, what could be a clearer waiver than his waiver? A clearer waiver than his waiver would be a written waiver without evidence in the record of confusion on the part of the defendant, which we have ample of here. Well, did he need someone to read it to him? Not necessarily, Your Honor. No, it just... He said he couldn't read or write. Pardon? Can't read or write. He argued that he couldn't read or write. We're not saying... The record's really not clear whether or not he's... That's what he said anyway. The record's not clear whether or not he's illiterate or not. I mean, he certainly has... The record suggests that he has learning disabilities, but whether or not he can read or write is less clear. He can sign his name perfectly, legibly. He can sign his name, correct. The correspondence between your client and his appointed state public defender that led up to the waiver suggests that he was very actively involved and knew exactly what was going on in his case, and tends to show that this was a knowing and voluntary waiver. I mean, there were a lot of letters back and forth, a lot of communication. It's all very lucid. He knew what stage the case was at. He knew of his right to respond to the no-merit report. Well, Your Honor, that's... On January 7th, his counsel wrote to him and closed with it the form waiver. And the letter informed him that if he didn't return it to them, if he didn't return it to him signed, that he would prepare and file a no-merit report on his behalf. Notably, the letter also informed him that the next deadline in the case is March 14th, 2008. He responded a couple days later, January 9th, 2008, and said that, no, he still wanted his counsel to go ahead and represent him, file the no-merit report. And then, you know, a few days later, his counsel, on January 14th, his counsel acknowledges receipt, says he'll file the no-merit report. Then two months go by without any communication between Mr. Jean-Paul and his attorney. And in that time, the March 14th, they had passed. And so on March 17th and 23rd, he writes to his attorney, like you mentioned, that he is inquiring into the status of his report. He was mistaken about the date. The deadline wasn't until May. He was mistaken about the date and, I mean, it's clear that he knows what a no-merit is and that he's going to have the right to respond. He was mistaken about the date only and, you know, only later decided that he wanted to go back to his original plan of No-merit isn't clear that he was only mistaken about the date. It's not really clear what the, you know, the depth of his confusion was. I mean, he was certainly at least confused about the date. And, I mean, given his confusion about the date, again, two months go by, there's no communication between himself and his attorney. He thinks that his time for, he thinks that the time, the no-merit report was due on March 14th. That deadline's passed. He's concerned that, he's concerned that his filing may be late. His time for responding is running. And that suggests that he's actively monitoring the case and knows the steps in the process and could knowingly and voluntarily waive his right to counsel. All of that tends to support the Wisconsin Court of Appeals decision rather than undermine it. Well, it suggests that he was at the very least confused about the deadlines. And it's, it's not fair to read into the, into the, just to assume his confusion was only to the deadlines. We know that there was the back and forth between himself and his attorneys. We don't know what the content of that conversation between himself and his attorney was that his attorney's referring to and his level of familiarity with the process. He wasn't confused about a no-merit report, was he? He knew that meant the attorney didn't think his case had any merit. It's, again, it's, the record isn't clear as to what he understood the no-merit report to be. I think he would probably look at the option of being pro se or having the attorney say there's no merit. Of course, if it went on to the Court of Appeals, he could, or he could bring in his own issues, what he thought, where there was merit, why the attorney was wrong. But otherwise, the attorney didn't think he had much of a case. I mean, that's certainly, that's Mr. Jean-Paul likely understood that, yes, he was going to have an opportunity to respond, but again, it's, we're making assumptions based on the silent record. How old is he? He's in his late 30s or early 40s. What's his educational background? He got, he has a high school diploma, but when he was in high school, he was in educationally uneducated, and he had a, he had a legal job. He's had a series of, of odd jobs, but he hasn't. What kind of jobs? I'm not 100% sure, Your Honor. Well, how about 90% sure? It's been, it's just the, the record just said that he had a series of, of odd jobs. Specifics, I'm not, I'm not sure, but it seems like it's, you know, some turnover there. What did he do? What was his crime? His crime was selling cocaine. This is a pretty stiff sentence for that crime in state court. Thirteen years in, 12 years of supervision, and so there must have been a lengthy criminal record suggesting, again, familiarity with the system. I mean, ordinarily, if it's a first offense, you don't get that kind of sentence in state court. The record suggested that he was expecting to get a, to get a shorter sentence as far as his criminal background. I can't, I'm not intimately familiar, familiar with it. So in January 2008, Mr. Jean-Paul went from declining representation to requesting it in a matter of days, and then after assuming that he would be represented, not hearing from his counsel for two months, and thus being confused about this March 14th deadline. Mr. Jean-Paul then signed the one-page waiver his counsel had sent to him three months earlier, and while the record shows that Mr. Jean-Paul's confusion, there's no evidence as to whether the confusion was ever resolved. And in, again, in Feretta, the Supreme Court teaches us that the defendant must be warned of the dangers and disadvantages of self-representation so that the record will show that he knows what he is doing and that the choice was made with eyes open. Well, he said that. Well, here the record shows that Mr. Jean-Paul invoked his right to counsel, but he was confused, and his waiver was anything but unequivocal. But, no, no, the written waiver is unequivocal, and he says, I understand that there are dangers and disadvantages in representing myself. Correct. So where's the confusion? The confusion, Your Honor, is in the context in which the waiver form was signed. He went from declining representation to requesting representation. Two months go by. He thinks that his time for preparing his response is running, and then potentially in a state of panic he signs the no-merit report because he feels that perhaps he needs to represent himself at this point. Again, the Supreme Court establishes a presumption against the waiver. I'm sorry, I don't understand that argument. The waiver of counsel occurred well in advance of the deadline for counsel to file the no-merit, didn't it? The waiver, it did, Your Honor. April 4th, and the deadline wasn't until May 9th? Right. So he couldn't have been in a state of panic about it? Your Honor, on January 7th, the letter that he received from his counsel memorializing the conversation wherein Mr. John Paul supposedly said he no longer wanted to represent himself contained an advisement that March 14th, 2008, was the next deadline to take action in his case. And then there was no communication of dates between them after that point. So he thought that March 14th, 2008, was a deadline. So that's what triggered the March 17th and March 23rd letters to both his lawyer and the clerk of the Court of Appeals. But counsel cleared that up, right? Well, they sent letters back to him, but the record doesn't show when Mr. John Paul received those letters, and it appears that it was likely too late because on April 4th, without any other indication in the record, Mr. John Paul signs this form, sends it back to his attorney. A couple days after that, his attorney moves to withdraw from the court, and it's granted like less than a week after that. Okay. Thank you, Mr. Anderson. Ms. Burgamy? Thank you, Your Honor. Good morning, Your Honors. May it please the Court? Sarah Burgandy representing Timothy Duma, and I'm here to ask the Court to affirm the district court's decision denying Mr. Jean Paul's habeas petition. Unless the Court has specific questions about the arguments on exhaustion waiver and the claim that Mr. Jean Paul raised below, I'm going to stand on my briefs on those points. Just briefly say that the claim he actually raised in state court and in district court was that the Court of Appeals didn't determine his competency to proceed pro se. That's not ñ there's no clearly established Supreme Court precedent demanding a court make that inquiry, and in this case there was no reason to believe that Mr. Jean Paul had trouble reading and writing that would have prevented him from representing himself pro se. On to the claim that Mr. Jean Paul is now raising. Essentially he's saying the waiver was not knowing and intelligent because there was a failure to explain the Court's role in the no-merit proceeding and because he suddenly changed his mind, and that should have prompted more inquiry by the Court. And what should be fatal really is that there's no clearly established Supreme Court precedent on those two alleged failings. Again, we're in habeas. The question is whether the Court of Appeals acted contrary to controlling Supreme Court precedent, and there's nothing to hinge on here. As to the Court's role in the no-merit, he relies heavily on bets, but that case was pretty factually different. There was wholesale denial of counsel, evidence that bets got bad advice. Here we have a pretty unequivocal waiver and other evidence that Jean Paul understood the process. He understood the no-merit process, that he would file a response. And as to the sudden change of mind, that alone is not enough to prompt the Court to query. As the Court of Appeals noted, that's not unusual for a client to change his mind. Mr. Jean Paul makes a big deal of the two months that passed. During that time, counsel was working on the no-merit report. There was nothing to communicate. And Jean Paul's later acts by appropriately dismissing the no-merit notice of appeal by going ahead and filing his appeal proper filings all indicate that he knew what he was doing. So unless the Court has any questions for me, I'm prepared to stand on my brief on that section as well. Okay. Thank you, Ms. Burgundy. Thank you. Mr. Ingersoll, do you have anything further? Thank you, Your Honor. Just really briefly to the point that Mr. Jean Paul didn't exhaust his argument. He did make two arguments in his habeas petition before the Wisconsin State Court of Appeals. That he was illiterate, but he also did argue that his waiver wasn't knowing and voluntary. He referenced that there should have been a colloquy, and his reference to the knowing and voluntary waiver was certainly enough to put the Court on notice of the underpinnings of his claim. Again, he doesn't have to cite the book and verse of the Constitution. He just needs to put the Court on notice, and he did that. Wisconsin has its own standard for competence to represent oneself. Right. That wasn't an issue before the state court? No. He argued that he was not competent to represent himself or competent to waive, but we're not raising that argument here. Right. That would be a state law issue in any event. Right. But this issue of whether there was exhaustion and waiver sort of parses the analysis into the knowing and voluntary basket and the competence basket. Is there a contention that both arguments were raised? No, Your Honor. We're arguing just that his waiver wasn't knowing and voluntary. And then just really briefly, again, Your Honor, given the presumption against waiver, given the presumption. In the document, his petition for habeas corpus, the handwritten document, is that his handwriting or someone else's? I'm not sure, Your Honor. Okay. Okay, well, thank you, Mr. Berman. Thank you, Your Honors. Next case for argument.